UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| WILLIAM BOUDREAU<br><br>Plaintiff,<br><br>v.<br><br>Experian Information Solutions, Inc.; TransUnion, LLC; Towne Mortgage Company<br><br>Defendants. | CASE NO.   24-cv-11009<br><br>COMPLAINT FOR DAMAGES:<br><br>1. Violation of Fair Credit Reporting Act |

Elliot Gale (P85770)
Gale, Angelo, Johnson, P.C.
2999 Douglas Blvd., Ste. 111
Roseville, CA 95661
916-290-7778
egale@gajplaw.com
Attorney for Plaintiff

COMES NOW Plaintiff William Boudreau (hereinafter "Plaintiff"), an individual, based on information and belief, to allege as follows:

## INTRODUCTION

1. This case arises under the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b), 15 U.S.C. § 1681e(b), 15 U.S.C. § 1681i(a)(2)(A)), 15 U.S.C. § 1681i(a)(4)), and 15 U.S.C. §1681i(a)(5)(A)),

2. Plaintiff seeks redress for the unlawful and deceptive practices committed by Defendants in connection with their inaccurate, misleading, and/or

1

incomplete reporting of Plaintiff's account with Towne Mortgage Company (hereinafter "TMC")

3. Here, TMC continues to report Plaintiff's account as discharged despite Plaintiff not including/discharging the loan through bankruptcy, and instead paying TMC off in full.
4. However, TMC, despite being paid in full, reported that the account was included/discharged in bankruptcy.
5. In addition, TMC's reporting of the payment history is inaccurate and incomplete.
6. Such reporting is misleading and adversely impacts Plaintiff's credit worthiness.
7. Plaintiff's credit reports have been disseminated to third parties since the completion of his Chapter 13 bankruptcy.
8. Plaintiff's credit has also been damaged as a result of the inaccurate and misleading reporting.
9. Plaintiff has been denied various unsecured credit cards as a result of the TMC account tradeline.
10. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system.
11. Creditors know that by deviating from recognized credit reporting standards consumers will have difficulty raising their credit scores and improving their credit worthiness.

## JURISDICTION & VENUE

12. Plaintiff re-alleges and incorporates herein by reference the allegations in each and every paragraph above, fully set forth herein.

13. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1367, and 15 U.S.C. § 1681.
14. This venue is proper pursuant to 28 U.S.C. §1391(b)(1).

## GENERAL ALLEGATIONS

15. Plaintiff alleges that each and every Defendant is familiar with credit reporting industry standards and subscribes thereto.
16. Plaintiff alleges that each and every Defendant understands that deviation from credit reporting industry standards can and often does result in denial of credit, higher interest rates, and prompts those making credit decisions to draw a more negative inference from the reported data than if the Defendant reported in accordance with the recognized industry standard.
17. Plaintiff alleges that all actions alleged herein by Defendants were done knowingly, intentionally, and in reckless disregard for credit reporting industry standards in an attempt to purposefully undermine Plaintiff's attempt to improve his FICO Score.
18. In the alternative Plaintiff alleges that each and every Defendants' actions were the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

### FICO, Inc.

19. FICO is a leading analytics software company with its principal headquarters located in San Jose California. FICO has over 130 patents related to their analytics and decision management technology, and regularly uses mathematical algorithms to predict consumer behavior including credit risk.
20. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent of lending decisions.

21. A FICO score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan.  FICO periodically updates its scoring models resulting in multiple FICO Score versions.
22. Base FICO Scores range from 300 to 850, while industry-specific FICO Scores range from 250-900.  A higher FICO Score demonstrates lower credit risk or less likelihood of default.
23. Different lenders use different versions of FICO Scores when evaluating a consumer's credit worthiness.
24. There are 28 FICO Scores that are commonly used by lenders.
25. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies (CRAs).
26. The three largest CRAs are Experian Information Solutions, Inc.; Equifax, Information Services, LLC, and Transunion, LLC.
27. FICO does not control what information is provided in a consumer's credit report. Instead, the scoring models or algorithms are based on the premise that information provided by the CRAs is accurate and complies with credit reporting industry standards.
28. There are five key factors that a FICO Score considers: 1) Payment History, 2) Amount of Debt, 3) Length of Credit History 4) New Credit and 5) Credit Mix.
29. Each of the five factors is weighed differently by FICO.
30. 35% of a consumer's FICO Score relates to payment history, 30% relates to the amount of debt, 15% relates to the length of credit history, 10% relates to new credit, and the last 10% relates to a consumer's credit mix or the different types of debts reported.
31. Payment history refers to whether a consumer has paid their bills in the past, on time, late or missed payments.  The more severe, recent, and frequent the late payment information, the greater the impact on a FICO

Score. Public record items such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

32. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

33. Once a delinquent account has been remedied the longer the account stays current the more a consumer's FICO Score should increase.

34. FICO Scores are entirely dependent upon information provided by data furnishers (DFs) to CRAs.

### e-OSCAR

35. E-OSCAR is the web-based Metro 2 compliant system developed by Experian Information Solutions, Inc.; Equifax Information Services, LLC; TransUnion, LLC and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

36. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification (ACDV) via e-Oscar to the DF.

37. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g. "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

### Metro 2

38. The Consumer Data Industry Association is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries.

39. The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by the CDIA in an effort to universally report debts in a particular manner that is understood to be the most accurate way in which to report a

debt. Specifically, Metro 2 format was designed to allow reporting of the most accurate and complete information on consumer's credit history.

40. The CDIA's Metro 2 format is the credit reporting industry standard for accurate credit reporting.
41. The credit reporting industry at large depends upon Metro 2 and the CDIA's recommendations for reporting debt accurately.
42. The CDIA is *the* expert on accurate credit reporting. In support of her allegations Plaintiff avers the following:
    a. The CDIA offers a FCRA certificate program for all CRAs.
    b. The CDIA offers a FCRA awareness program for all CRAs.
    c. The CDIA offers a FCRA Certificate program for DFs.
    d. The CDIA offers a FCRA awareness program for DFs.
    e. The CDIA offers a Metro 2 Learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 Format as well as the relationship between multiple fields.
    f. The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and Transunion.
    g. The CDIA developed a credit reporting resource guide for accurately reporting credit.
43. The CDIA's Metro 2 is accepted by all CRAs.
44. The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide (CRRG).
45. The CRRG outlines the industry standards for most accurately reporting debts using Metro 2.
46. The three main credit bureaus helped draft the CRRG.
47. The CRRG is not readily available to the public. It can be purchased online for $229.45.

48. Even if a buyer is ready willing and able to pay for the CRRG, the CDIA will NOT grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.
49. When FICO calculates credit scores the algorithms use Metro 2 information based on industry standards established by the CDIA.
50. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.
51. If the Metro 2 data received by FICO deviates from industry standards an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower a consumer will be considered a higher credit risk resulting in less favorable lending terms.
52. All three major CRAs are members of the CDIA
53. The CDIA is on record that they know, understand, and accept mortgages are generally non-dischargeable under 11 U.S.C. §1328(c)(1) and 11 U.S.C. § 1322(b)(5).

### Consumer Information Indicator

54. When a consumer files for bankruptcy protection certain credit reporting industry standards exist.
55. Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's credit worthiness.
56. The Consumer Information Indicator (CII) is a critical field in the Metro 2 Format that indicates a special condition that applies to a specific consumer.
57. Under Metro 2 the CII must be reported only on the consumer to whom the information applies.
58. It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

59. In the consumer bankruptcy context CII Metro 2 Code "A" denotes that a petition for Chapter 7 has been filed, is active, but no discharge has been entered.
60. CII Metro 2 Code "D" indicates that a Chapter 13 petition has been filed, is active, but no discharge entered. This is usually translated on a consumer credit report as "Wage Earner Plan" or "WEP" in the "Account Status" portion of a trade line. Such reporting alerts any potential lender that the account is no longer in a collectable status but is being handled by a Chapter 13 trustee.
61. The CII Metro 2 Code "Z" indicates that a bankruptcy petition has been filed but the chapter is undesignated/unknown.
62. The CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.
63. The CII Metro 2 Code "H" denotes that a Chapter 13 bankruptcy has been discharged.
64. The CII Metro 2 Code "Q" is used when a bankruptcy plan is complete and will remove prior bankruptcy codes on the account; the CII Q is used on liabilities that are not discharged in bankruptcy (such as a vehicle loan).
65. The CII field is a critical field for consumers and directly relates to and impacts a consumer's credit worthiness.
66. Failure to update the CII to a "Q" on a secured non-discharged debt results in it appearing that a consumer, like Plaintiff, included an account in a bankruptcy proceeding despite not having done so.
67. It also may result (as is the case here) where it appears an account continues to be in an *active* bankruptcy when in fact no bankruptcy case is pending.
68. It also results in the account being calculated as a major derogatory or adverse account despite the fact it was not included or discharged.

69. The result lowers a consumer's credit score and makes a consumer appear much less credit worthy.

### Plaintiff's Dispute

70. In January of 2024 Plaintiff ordered credit reports from Experian, Equifax, and TransUnion to ensure proper reporting by Plaintiff's creditors after his Chapter 13 bankruptcy was completed.

71. Plaintiff noticed various delinquent and adverse trade lines on his January 2024 credit report, such as TMC reporting inaccurate information regarding his paid off home loan.

72. Specifically, TMC was reporting that Plaintiff's mortgage was closed and subject to an active chapter 13 bankruptcy.

73. On information and belief Plaintiff alleges that upon the filing of Plaintiff's bankruptcy TMC reported the account closed and stopped reporting timely payments despite the account not being closed and Plaintiff continuing to make timely payments.

74. In response to his initial review, Plaintiff disputed the TMC tradeline with Experian, Equifax, and TransUnion via certified mail.

75. Plaintiff's dispute letters specifically put the Defendants on notice that the account should not be listed as discharged, included in bankruptcy, and making payments under a wage earner plan as the accounts were not included, discharged, or subject to a bankruptcy.

76. Plaintiff's dispute indicated that the TMC account should not be included/discharged in bankruptcy and should show timely payments were made up until the mortgage was paid off.

77. Plaintiff is informed and believes that each CRA received Plaintiff's dispute letter and in response sent Plaintiff's dispute to TMC via an ACDV through e-OSCAR.

78. In March of 2024, after the statutory time period had elapsed for Plaintiff to receive a reinvestigation report from the credit Bureaus, Plaintiff ordered supplemental credit report from Experian, Equifax, and TransUnion for the sole purpose to ensure Plaintiff's account with TMC had in fact been updated.

**Inaccuracy –TMC**

79. Plaintiff was frustrated to see that Defendant TMC did not properly update the account.
80. TMC was still reporting the account as included and or discharged in bankruptcy and making payments under a wage earner plan despite the account not being included or discharged in Plaintiff's chapter 13 bankruptcy.
81. TMC's reporting is inaccurate because Plaintiff did not include or seek to discharge his TMC loan as the account was paid directly.
82. In fact, Plaintiff paid off the loan, in full prior to any discharge being entered.
83. TMC received notices of Plaintiff's bankruptcy filing and treatment under Plaintiff's chapter 13 plan, where the plan explicitly stated that the account was to be paid directly by Plaintiff.
84. TMC's reporting is entirely incomplete, misleading and technically inaccurate.
85. The reporting is incomplete because the report lacks any updates on the account that would allow a potential lender to know that Plaintiff did not alter, modify, or discharge his account in any manner; nor did Plaintiff fail to make timely payments.
86. Instead, Plaintiff made all timely account payments and did not alter the agreement in any fashion.

87. TMC should have updated the CII to report a "Q" as instructed by the CRRG after Plaintiffs completed his chapter 13 plan, or at the time he paid off the mortgage in full.
88. As it stands it appears that TMC continues to report the CII "D" making it appear that Plaintiff continues to be in an active bankruptcy and that the account may or may not be subject to Plaintiff discharge given that such a discharge has been completed.
89. To be clear, it is IMPOSSIBLE for accuracy purposes for TMC to accurately report a CII "D" post discharge.
90. The CII "D" should only be reported during an active bankruptcy. Plaintiff is no longer in bankruptcy and the account at issue was: 1) not discharged per the CRRG and the bankruptcy code, and 2) not currently in bankruptcy.
91. As a result, TMC should know that the CII "D" cannot possibly be accurate.
92. Such reporting remains wholly incomplete and would lead lenders to question whether or not Plaintiff has made his mortgage payments consistently.
93. Such reporting makes Plaintiff appear less credit worthy.

**Damages**

94. As a result of the incorrect reporting, Plaintiff has suffered economic loss, diminished credit, and emotional harm.
95. TMC's inaccurate reporting has been transmitted to third parties since Plaintiff completed his Chapter 13 case and negatively impacted Plaintiff's ability to obtain and rebuild his credit.
96. TMC's reporting has diminished Plaintiff's credit score.
97. The actions of Experian, TransUnion, and TMC, as alleged herein are acts in violation of the Fair Credit Reporting Act.

## FIRST CAUSE OF ACTION

(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))
Against Defendants Experian and TransUnion)

**Experian Information Solutions, Inc., TransUnion, LLC – Failure to Assure Credit Reporting Accuracy.**

98. Plaintiff realleges and incorporates herein the allegation in each and every paragraph above as though fully set forth herein.

99. Experian and TransUnion violated 15 U.S.C. § 1681e(b) by failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and credit files it published and maintained concerning Plaintiff.

100. Had Experian and TransUnion maintained reasonable procedures to assure maximum accuracy Experian and TransUnion would never have allowed Defendant TMC to report the account as described herein.

101. TMC's payment history reflects no payments on the account despite Experian and TransUnion receiving proof of timely payments from Plaintiff.

102. In addition, TMC appears to be reporting a "CII" that refers to an active bankruptcy.

103. Experian and TransUnion all are reporting that Plaintiff has completed his bankruptcy and therefore should know that TMC's reporting cannot possibly be accurate.

104. Even assuming Experian and TransUnion are not sophisticated enough to address this obvious contradiction, Plaintiff disputed the account and Experian and TransUnion still did not fix the issue.

105. Plaintiff informed Experian and TransUnion that the information reported by TMC was incorrect because Plaintiff provided verification that TMC account was not discharged and that TMC received timely payments until it was paid in full.

106. Instead, the accounts remain inaccurate.

107. As a result of Experian and TransUnion's violation of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: diminished credit, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

### Willfulness

108. The violations described herein by Experian and TransUnion were willful, specifically the Credit Bureaus have intentionally and purposefully set up a system where inaccuracies are not only probable but inevitable.
109. In 2012 the FTC reported that 1 in 5 consumer credit reports contains a material error.
110. Such a finding should shock the conscience.
111. When those errors are disputed Experian and TransUnion intentionally send consumer disputes to employees who do not live within the continental United States.
112. This is intentionally done to hide and or subvert a consumer's ability to confront individuals directly responsible for approving accurate reporting.
113. Such a policy also inevitably leads to disputes going unresolved as these employees for Defendants Experian and TransUnion receive little to no training concerning how to accurately report consumer debt.
114. Instead, these employees are simply instructed to parrot whatever information a data furnisher provides regardless of whether or not that information is accurate. *See Saez v. Trans Union,* LLC, 621 F. Supp. 2d 1074, 1083, 1088 (D.Or. 2007); *Grigoryan v. Experian Info. Sols.*, Inc., 84 F. Supp. 3d 1044, 1091 (C.D. Cal. 2014); *Haykuhi Avetisyan v. Experian Info Sols.*, No. CV 14-05276-AB (ASX)
115. Experian and TransUnion employees are regularly expected to review and approve over 90 disputes per day rendering less than five minutes to review, investigate, and respond to each dispute received.

116. Experian and TransUnion have intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

117. Experian and TransUnion also allowed TMC to report the account with inaccurate information despite specifically being told in the dispute letter why the information TMC was reporting was incorrect.

118. Despite Experian and TransUnion having actual knowledge of Plaintiff's bankruptcy, TMC reporting the account included in an ongoing bankruptcy, and the bankruptcy actually being closed, Experian and TransUnion continue to allow TMC to report the account included in an active bankruptcy without reporting timely payments.

119. Not only are Experian and TransUnion allowing TMC to report in a manner that they know is factually impossible (an account cannot be included in an on-going bankruptcy if the bankruptcy has been closed) but in a manner the CDIA has specifically briefed as inaccurate.

120. As a result, Experian and TransUnion are allowing TMC to report in a manner they know is factually and legally inaccurate.

121. Consequently, Defendants Experian and TransUnion are liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

122. In the alternative, Experian and TransUnion were at least negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

123. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian and TransUnion in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

**SECOND CAUSE OF ACTION**
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681s-2(b))
Against All Defendants)

**TMC – Failure to Reinvestigate.**

124. Plaintiff realleges and incorporates herein the allegations in each and every paragraph above as though fully set forth herein.

125. 15 U.S.C. §§ 1681s-2(b) and 1681i-(a)1 prohibits furnishers from providing any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate or misleading and requires a furnisher to update and or correct inaccurate information after being notified by a consumer reporting agency of a dispute by a consumer.

126. Defendant TMC violated section 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading and inaccurate account information.

127. The CRAs provided notice to TMC that Plaintiff was disputing the inaccurate and misleading information, but TMC failed to conduct a reasonable investigation of the information as required by the FCRA.

128. Based on Plaintiff's dispute, TMC should have known that its reporting was incomplete as Plaintiff's dispute letters highlighted the problems with the tradeline.

129. Further, TMC should have known Plaintiff's mortgage was paid directly given its treatment under the terms of Plaintiff's chapter 13 plan.

130. The most basic investigation would simply involve reading Plaintiff's dispute letters.

131. Plaintiff alleges TMC did not review well established industry standards for credit reporting.

132. If TMC had reviewed such standards, it would have seen its reporting was inaccurate and or incomplete.

133. Had TMC reviewed the dispute and done any type of investigation, it would have known that Plaintiff maintained direct account payments on the loan

and did not seek to discharge or otherwise surrender / cancel the loan agreement.

134. The lack of investigation is unreasonable.

135. Plaintiff further alleges that TMC both have not properly trained those directly investigating disputes on Metro 2 generally or credit reporting industry standards and as such have developed reckless policies and procedures.

**Experian and TransUnion – Failure to Reinvestigate Disputed Information.**

136. Plaintiff re-alleges and incorporates herein the allegations in each and every paragraph above as though fully set forth herein.

137. After Plaintiff disputed the account mentioned above, Experian and TransUnion were required to conduct a reasonable investigation and to delete any information that was not accurate under 15 U.S.C. § 1681i-(a)1.

138. Experian and TransUnion failed to conduct a reasonable investigation and failed to correct the misleading and or inaccurate statements on the account within the statutory time frame or at all.

139. Experian and TransUnion could not have possibly done any type of reasonable investigation into this matter as Plaintiff explicitly provided information regarding payment of the loans and verified the loans were paid off.

140. Similarly, Plaintiff explained that the TMC account was paid directly through his chapter 13 bankruptcy until it was paid in full.

141. Plaintiff alleges that Experian and TransUnion both have its own independent duty to conduct a reasonable investigation 15 U.S.C. § 1681i-(a)1.

142. Experian and TransUnion are not passive entities bound to report whatever information a DF provides.

143. Given the aforementioned, Plaintiff allege that Experian and TransUnion can and do suppress inaccurate information from being reported when DFs provide inaccurate information.

144. Experian and TransUnion can and do instruct DFs on how to properly report certain accounts from time to time upon request from the DF.

145. Experian and TransUnion failed to conduct a reasonable investigation because any basic investigation would have included a review of Plaintiff's dispute letters.

146. Experian and TransUnion therefore did not do the most basic investigation regarding credit reporting industry standards otherwise the aforementioned would have been uncovered.

147. Experian and TransUnion intentionally, willfully or with reckless disregard for Plaintiff's accuracy did no investigation whatsoever given that Experian and TransUnion's general policy is to simply parrot whatever information a data furnisher sends.

148. Such policies and procedures inherently lead to inaccurate information being reported and therefore such an investigation is wholly unreasonably and reckless i.e. willful.

### THIRD CAUSE OF ACTION
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))
Against Defendants Experian and TransUnion)

**Experian and TransUnion – Failure to Review and Consider All Relevant Information.**

149. Plaintiff realleges and incorporates herein the allegations in each and every paragraph above as though fully set forth herein.

150. Experian and TransUnion violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

151. As a result of Experian and TransUnion's violation of 15 U.S.C. § 1681i(a)(4), Plaintiff suffered actual damages, including but not limited to, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

152. The violations by Experian and TransUnion were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

153. In the alternative Experian and TransUnion were negligent, which entitle Plaintiff to recovery under 15 U.S.C. § 1681o.

154. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian and TransUnion in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

**FOURTH CAUSE OF ACTION**
(Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))
Against Defendants Experian and TransUnion)

**Experian and TransUnion, – Failure to Delete Disputed and Inaccurate Information.**

155. Plaintiff re-alleges and incorporates herein the allegations in each and every paragraph above as though fully set forth herein.

156. Experian and TransUnion violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

157. As a result of Experian and TransUnion's violation of 15 U.S.C. § 1681i(a)(5)(A), Plaintiff suffered actual damages, including but not limited to, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

158. The violations by Experian and TransUnion were willful, rendering each of the Defendants individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

159. In the alternative, Experian and TransUnion were negligent, which entitle Plaintiff to recovery under 15 U.S.C. § 1681o.

160. Plaintiff are entitled to recover actual damages, statutory damages, costs and attorney's fees from Experian and TransUnion in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o. Wherefore, Plaintiff prays for judgment as hereinafter set forth.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rules of Civil Procedure 38, Plaintiff hereby demands a trial by jury for all issues triable by jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

1. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;
2. Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;
3. Award attorney's fees and costs of suit incurred herein pursuant to 15 U.S.C. § 1681n & o;
4. For determination by the Court that Creditor's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, et seq.; and
5. For determination by the Court that Creditor's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.